**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------------X

SATAN WEARS SUSPENDERS, INC.,                    :
                                                 :
                                    Plaintiff,   :        Index No.
                                                 :
            -against-                            :
                                                 :        **COMPLAINT**
NICOLAS JAAR and DAVID HARRINGTON, p/k/a         :
Darkside, Darkside USA and/or Darkside the Band, and :
MATADOR RECORDS, INC.                            :
                                                 :
                                    Defendants.  :
                                                 :
                                                 :
-----------------------------------------------------------------------X

Plaintiff SATAN WEARS SUSPENDERS, INC. p/k/a Darkside or Darkside NYC

("Plaintiff), by its attorneys Pierce & Kwok LLP, alleges the following as and for its complaint

against NICOLAS JAAR and DAVID HARRINGTON p/k/a Darkside, Darkside USA and

Darkside the Band, and MATADOR RECORDS, INC. ("Matador") (collectively, "Defendants"),

upon information and belief:

## NATURE OF THE ACTION

1.  This is an action for (i) trademark infringement and unfair competition under § 32 (1) of the

    Lanham Act, 15 U.S.C. § 1114(1); (ii) unfair competition and false designation of origin

    under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A),(c); (iii) dilution under the laws

    of New York State, GEN. BUS. Law § 360-1; (iv) unfair and deceptive trade practices under

    the laws of New York State, N.Y. GEN. BUS. Law § 349; (v) unfair competition under the

    common law of the State of New York; (vi) contributory trademark infringement, unfair

    competition, and dilution; and (vii) vicarious trademark infringement, unfair competition,

    and dilution. Plaintiff seeks permanent injunctive relief, an accounting, statutory damages,

compensatory damages, recovery of their costs and attorneys' fees, and other relief authorized by the Lanham Act, and applicable state and common law.

## JURISDICTION AND VENUE

2. This action arises under the Lanham Act, 15 U.S.C. §§ 1051 et seq. This Court has jurisdiction under 28 U.S.C. §§ 1331, 1338(b), and 1367 under principles of pendent jurisdiction.

3. Venue is proper pursuant to 28 U.S.C. §§ 1391 (a), (b), and (c).

4. This Court has personal jurisdiction over the Defendants pursuant to New York Civil Practice Law and Rules §§ 301 and 302 because Defendant Matador has its principal place of business (its nerve center) in New York State and, separately, since the harm alleged by Plaintiff stems from conduct by Defendant originating in New York State, County of New York.

## THE PARTIES

5. Plaintiff Satan Wears Suspenders, Inc. is a corporation duly organized and validly existing under the laws of the State of New York.

6. Upon information and belief, Defendant Nicolas Jaar is an individual domiciled in New York, New York ("Jaar").

7. Upon information and belief, Defendant David Harrington is an individual domiciled in the State of New York ("Harrington").

8. Upon information and belief, Defendant Matador Records, Inc. is a New York corporation with a principal place of business located at 304 Hudson Street, 7th Floor, New York, NY 10013 ("Matador").

## FACTS COMMON TO ALL CAUSES OF ACTION

9. Plaintiff operates and conducts business as a rock music group and independent record label.

10. Plaintiff engages in live musical performances and produces musical sound recordings under the names DARKSIDE or DARKSIDE NYC since 1992.

11. Plaintiff has continuously used the names DARKSIDE and DARKSIDE NYC (collectively, the "Band") since at least as early as October 21, 1992. *See* a true and correct copy of a screenshot from the e-commerce site, https://www.atomikclimbingholds.com/, which sold an EP released by the Band in 1993, annexed hereto as **Exhibit A**.

12. Plaintiff is the sole owner of the trademark, "Darkside NYC" (the "Trademark"), as that term is used to denote the source for (i) entertainment in the nature of live performances by a hardcore punk rock/metal band; (ii) entertainment, namely, live performances by a musical band; live performances by a musical group; (iii) production of musical sound recording; (iv) production of musical videos; production of sound and music video recordings; and (v) providing a website featuring information in the field of music and entertainment (collectively, the "Trademark Registered Services").

13. The Trademark was registered with the United States Patent and Trademark Office (USPTO) on June 17, 2014. *See* registration of the trademark (the "Registration") annexed hereto as **Exhibit B** and incorporated by reference herein

14. Accordingly, the Trademark is deemed *prima facie* valid and enforceable.

15. Further, Plaintiff has continuously used the Trademark for more than six years from the date of registration until the present.

16. Plaintiff continues to use the Trademark to denote the Registered Trademark Services.

17. Consequently, the Trademark has achieved incontestability status. *See* a true and exact copy of the Notice of Acknowledgement Under Section 15 from USPTO annexed hereto as **Exhibit 1**

18. As such, the Trademark is valid, enforceable, distinctive, and can only be challenged on the

basis of fraud or genericism.

19. As an arbitrary trademark, and strictly used as such in interstate commerce by Plaintiff to inform the public that it is the source for the Registered Trademark Services, the Trademark remains inherently distinctive, and its registration was not procured through fraud.

20. Thus, Defendants have no basis to challenge the Trademark's validity.

21. Fans of DARKSIDE NYC often refer to the Band simply as "DARKSIDE," and have done so since the Band's inception in 1991.

22. Moreover, since USPTO required Plaintiff to disclaim the "NYC" portion of its Trademark in order to receive registration, DARKSIDE became the dominant portion of the Trademark, and, as a result, it is the term DARKSIDE that Plaintiff has the exclusive right to use to denote the source for the Trademark Registered Services.

23. The Trademark is inherently distinctive and has been extensively used, advertised and promoted in interstate commerce, and throughout the world, in connection with the Trademark Registered Services.

24. To wit, several tracks by the Band under the Trademark have been released on record labels in America, Europe, and Asia.

25. Since at least as early as 1992, Plaintiff has invested tens of thousands of dollars protecting and promoting the Trademark so that consumers widely recognize the DARKSIDE NYC mark as the sole identifier for the Trademark Registered Services.

26. As a result of Plaintiffs' investment, time and efforts, the Trademark has acquired significant and valuable goodwill within the music industry and among fans and consumers.

27. Consequently, the Trademark represents one of Plaintiff's most significant assets.

28. Defendants have actual and constructive notice and knowledge of Plaintiffs' rights in and under the Trademark.

29. Upon information and belief, Defendants Jaar and Harrington first formed a music group called Darkside or Darkside USA in 2011.

30. Upon information and belief, Defendants Jaar and Harrington's first commercial use of the names Darkside, Darkside USA, or Darkside the Band, in either or all cases, occurred on or about November 2011, with the release of a sound recording titled "Darkside."

31. Upon information and belief, Defendants Jaar and Harrington first performed as Darkside, Darkside USA, or Darkside the Band, in either or all cases, on or about December 2011, at the Music Hall of Williamsburg, in Brooklyn, New York.

32. Plaintiff has played at the same venue.

33. Defendants have played and will likely continue to play at other venues and outlets where Plaintiff has played, such as The Paperbox and Silent Barn venues in Bushwick, Brooklyn, and East Village Radio in Manhattan.

34. Consequently, some fans of both music groups probably overlap.

35. Upon information and belief, Defendants Jaar and Harrington operate Darkside, Darkside USA, or Darkside the Band, in either or all cases, in New York City, as Defendants Jaar and Harrington's studio is located in Brooklyn, NY, both reside within New York City, and the majority of activities surrounding Defendants' band are performed there.

36. Defendants Jaar and Harrington have continuously performed as Darkside, Darkside USA, or Darkside the Band, in either or all cases, since 2011.

37. At the time of first use of the name Darkside, Darkside USA, or Darkside the Band, in either or all cases, Defendants Jaar and Harrington had constructive notice of Plaintiffs' rights in and under the trademark, as a basic Internet search of the term "Darkside" would have yielded information relating to the Band, including its close nexus to New York City, specifically its roots in the borough of Brooklyn.

38. Nevertheless, in derogation of Plaintiff's legal rights, Defendants Jaar and Harrington purposefully adopted the dominant portion of the Trademark, DARKSIDE, to denote the same Trademark Registered Services, notwithstanding that USPTO has conferred the right to use DARKSIDE to identify same only on Plaintiff.

39. Defendants Jaar and Harrington, despite repeated objections from Plaintiffs in 2013 and 2014, continue to use a name confusingly similar to Plaintiffs' mark, DARKSIDE NYC.

40. Thus, Defendants' are aware that their usage of the Trademark is willfully infringing the exclusive rights of Plaintiff.

41. Without legal right, Defendants Jaar and Harrington also have registered and continue to use the domain name http://www.darksidetheband.com ("Defendants' Site"), wherein Defendants appropriate the DARKSIDE mark. *See* a true and exact copy of Defendants' website accessed on January 14, 2021 annexed hereto as **Exhibit D**

42. Below is a side-by-side comparison of the competing marks:

| The Trademark | Defendants' trademarks (collectively, the "Defendants' Trademarks") |
|---|---|
| **DARKSIDE NYC** | **Darkside**<br>**Darkside USA**<br>**Darkside the Band** |

43. Plaintiff did not claim the Trademark's font, size, nor capitalization scheme as elements thereof in its registration.

44. Thus, the Trademark is a standard character mark.

45. Therefore, Plaintiff can display the Trademark however it chooses, including displaying it in different colors, in different font sizes, and in stylized lettering.

46. The Defendants' Trademarks are not registered trademarks with the USPTO.

47. Thus, there is no limitation to the way the Defendants' Trademarks can appear in commerce.

48. As a result, the infringement and unfair competition described herein is likely to cause substantial fan confusion and confusion among the public in general, because fans who seek to transact business with one "Darkside" in New York, are likely to inadvertently interact with the other; particularly since both musical acts perform in the same neighborhoods, at the same venues, and before similar groups of fans.

49. In fact, the foregoing infringement has caused and will continue to cause actual confusion, evidenced by, without limitation, third parties who have (i) distributed Defendant's music incorrectly and unlawfully under the Trademark or DARKSIDE, (ii) distributed Plaintiffs' music but incorrectly attributed Defendants as the source thereof, and (iii) become confused on social media and referenced the Trademark or DARKSIDE in connection with Defendants.

50. The public continues to be confused as to the source of the Trademark Registered Services bearing or sold under the Trademark or DARKSIDE.

51. Defendants' appropriation of the Trademark, including its dominant portion DARKSIDE, not only damages the goodwill and reputations of Plaintiff, but it deceives the public as well.

52. New York City is renowned throughout the country as a unique and central source for "hardcore" rock music, Plaintiffs' sub-genre of music.

53. And even beyond New York City, Plaintiffs have built significant goodwill and appeal in the Trademark in the Tri-State area.

54. Hence, maintaining the Trademark's connection to New York City's music scene is pivotal

to the Band's success, ability to maintain goodwill, and worldwide appeal and recognition.

55. Defendants' unauthorized use of "Darkside" infringes on Plaintiffs' rights because Defendants are providing identical services as Plaintiff, to the same class of consumers, using the same channels of commerce, all while using the same distinctive trademark, DARKSIDE.

56. Defendants' conduct irreparably interferes with Plaintiffs' exclusive right to market and provide the Trademark Registered Services in New York City and throughout the United States.

57. Defendants are using the similarity of its trademarks to that of the Trademark to (i) sow confusion among the public, (ii) free ride off the strength and reputation of the Trademark through Plaintiff's successful promotion of the Band, and (iii) divert customers and fans from Plaintiff's Site to Defendant's Site.

58. Defendants' infringing conduct has and will continue to cause dilution of Plaintiffs' brand because even though consumers may not be confused at to the source of Trademark Registered Services, that Defendants' Trademarks are nearly identical to the Trademark diminishes the distinctiveness of the Trademark because it forces consumers to employ additional mental machinations to figure out which DARKSIDE is being referenced when they see the competing marks in commerce.

59. Google is the search engine used by most people in the United States, including Plaintiff's fans and prospective customers, when they are looking for venues to watch rock bands perform in New York City and the greater Tri-State area, and to purchase their sound recordings.

60. Search engine optimization ("SEO") ranking is critical to a website's ability to attract to new customers.

61. Plaintiff has spent thousands of dollars and hundreds of hours of labor to ensure Plaintiff's Site has a strong SEO ranking.

62. Research has shown that only websites listed on Google's first page are likely to attract new customers, which is why having a high SEO ranking is essential.

63. Customers believe that the higher the website's ranking, the more trustworthy and suitable it is to satisfy the customer's needs.

64. Plaintiff's website is www.darksidenyc.com ("Plaintiff's Site").

65. Defendants' Site incorporates the entirety of the dominant portion of the Trademark, the only term in which Plaintiff has the exclusive right to use to identify the Trademark Registered Services, DARKSIDE.

66. Resultingly, Defendants' Site is confusingly similar to Plaintiff's Site since both websites use DARKSIDE in their domain names.

67. Specifically, at some point in or around 2020, upon information and belief, Defendants started using the tag words "darkside," "band," "dark side, "darksidemusic," "darkside rock band," "darkside usa," "darkside NY," "darkside live music," "darkside rock music", and other similar words and phrases used by Plaintiff to identify the Trademark Registered Services, in Defendant's metadata on the Defendant's Site; so that when consumers use Google to search for a rock band in the Tri-State (New Jersey, New York, and Connecticut metropolitan areas) under or in connection with DARKSIDE, it will be directed to the Defendant's Site, instead of to Plaintiff's Site.

68. A website's developer or manager must be continually updating the website and creating content that includes important search terms, or "tag words," that the developer or manager believes most customers are likely to use when searching Google for goods or services that the website offers.

69. Plaintiff has spent thousands of dollars and hundreds of hours of labor to ensure Plaintiff's Site has a strong SEO ranking.

70. Defendant is using the similarity of the name of Defendants' Site with that of Plaintiff's Site to purposefully confuse consumers and divert customers from Plaintiff's Site to Defendant's Site.

71. On the three most popular sites that consumers use to learn about new music and musicians, Google, YouTube and Soundcloud, Defendants' Site has surpassed Plaintiff's Site in ranking and has, thus, usurped Plaintiff's exclusive right to use DARKSIDE to identify the Registered Trademark Services.

72. Currently, Internet searches on Google.com containing the term "darkside the band," "darkside rock music," "darkside usa," "darkside music," "dark side live music," and "darkside NY," in each case, with the exception of Darkside NY, all rank Defendants' Site above Plaintiff' Site, which means consumers are more likely to visit Defendants' webpage before they visit Plaintiff's webpage, if they end up visiting the Plaintiff's Site at all. *See* a true and example of the Google screenshots accessed on January 19, 2021 annexed hereto as **Exhibit 2**

73. Similarly, Internet searches on YouTube.com for videos containing the term "Darkside band" reveal Defendants' band to be the top entry. *See* **Exhibit 3**

74. The same is true on SoundCloud under "DARKSIDE".

75. Regrettably, SoundCloud lists Defendants as the top entry, and states that they are based out of New York City. *See* **Exhibit 4**

76. Therefore, according to SoundCloud, although incorrectly, Defendants have supplanted Plaintiff as being the "true" DARKSIDE rock band.

77. By listing Defendants above Plaintiffs as they are, based on errant information provided to

them by Defendants, all three platforms are adding to the likelihood of confusion.

78. More alarmingly, Internet searches for "Darkside New York" on Google result in Defendants' band name and New York performances being listed in several of the top search results-above Plaintiff. *See* **Exhibit 5**

79. Defendants' use and misuse of confusingly similar marks in New York City, as well as their activities in New York City implying a similar connection, irreparably harms Plaintiffs' right and ability to market the DARKSIDE NYC mark, as well as Plaintiffs' goods and services, in New York City and throughout the United States.

80. Defendants' conduct also exacerbates the deception on the public as to the source of the Trademark Registered Services associated with DARKSIDE.

81. Defendants' use, and misuse, of confusingly similar marks is likely to and does permit them to misappropriate and unfairly trade on the valuable goodwill and reputation of Plaintiff, and will subject that goodwill and reputation to the hazards of Defendants' business activities, over which Plaintiff has no control.

82. Defendants' use, and misuse, of confusingly similar marks constitutes false designation of origin as to the Trademark Registered Services made available by Defendants in interstate commerce.

83. Consumers who use and interact with Defendants' goods and services, or who are exposed to advertisements for said goods and services, are led to believe that Defendants' goods and services originate with Plaintiff, or are sponsored or endorsed by, or affiliated with, Plaintiff.

84. Defendants have no valid connection or affiliation with Plaintiffs or Plaintiffs' mark.

85. Plaintiff has no control over Defendants' acts or the quality of goods and services offered by Defendants, causing further dilution of Plaintiffs' DARKSIDE mark.

86. The fans of both Plaintiff and Defendants tend not to be sophisticated consumers who do

not heavily scrutinize the trademarks of the goods or services they are buying.

87. Hence, Plaintiff's own fans, and fans of the genre of hardcore/metal music generally, who encounter Defendants' goods and services, are likely to be, and have been confused as to the source of Plaintiff's goods and services.

88. Fans of hardcore/metal music in general, and Plaintiffs' fans and consumers in particular, are likely to develop a strong negative connotation of Plaintiffs' name DARKSIDE NYC, after they hear Defendants' music, and associate the Trademark with Defendants.

89. Defendants, by their use and misuse of confusingly similar marks, have caused Plaintiff harm and, unless restrained by this Court, will continue to cause substantial damage and irreparable injury by creating consumer confusion, competing unfairly with Plaintiffs, falsely designating the origin of goods and services, and causing loss of control over Plaintiffs' reputation. Such wrongful acts have caused and will continue to cause deception and harm to the public as well.

90. Another example of the actual confusion and harm that is occurring can be found in Defendants' most recent press release (the "Press Release"), where they inform the public that they are DARKSIDE the rock band and are releasing new music son *See* a true and exact copy of the Press Release annexed hereto as **Exhibit 6**

91. Plaintiffs have no adequate remedy at law to prevent Defendants' malfeasance.

## FACTS RELEVANT TO THE CAUSE OF ACTION AGAINST MATADOR AND OTHER PEOPLE

92. Defendant Matador is a record label that has been in operation since 1990.

93. Matador's headquarters, "nerve center," and principal place of business is located in New York City.

94. Matador conducts substantial business in New York City, as well as around the world by, upon information and belief, signing artists, advancing money to said artists, and covering

the costs of the artists' recording costs, wardrobe, and live performances until it recoups such costs.

95. Matador signed Defendants Jaar and Harrington's Darkside band to its roster of artists, and actively promotes the band, including providing financing and arranging touring, promotions, live appearances, and including funding and distribution of its sound recordings, most notably the album "Psychic," released under the Matador label.

96. Matador maintains significant control and oversight over the activities of Defendants Jaar and Harrington's Darkside band.

97. Upon information and belief, Matador maintains significant control over Defendants' Site, including actively editing and filtering its content.

98. Matador owns, operates and maintains a website located at domain name http://www.matadorrecords.com ("Matador's Site").

99. Matador prominently features Defendants' band "Darkside" throughout Matador's Site as a "Current Artist." *See* **Exhibit 7**

100. Matador knows or has reason to know of the infringement of the Trademark by Defendants, as a simple Internet search using the term "Darkside" would have revealed information relating to Plaintiffs' Band, including its close nexus to and roots in New York City.

101. Moreover, Defendants are aware of Plaintiff's claim of trademark infringement and unfair competition.

102. And by acting on behalf of Defendants, in an agency/principal relationship, such knowledge is imputed on Matador.

103. Further, had Matador performed a modicum of due diligence, it would have found that the Trademark is registered with USPTO.

104.     Despite Matador's claims on its website that it "has been a champion of artistic

freedom, diversity and innovation," Matador knowingly supplies its significant resources,

skill and capital in the music industry to further Defendants Jaar and Harrington's careers,

even though it knows or should have known of the trademark infringement.

105.     Matador makes substantial profit from Defendants' ever-increasing success, and thus

profits directly from the infringement.

## FIRST CLAIM FOR RELIEF

(Trademark Infringement pursuant to 15 U.S.C.A § 1125)

106.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 105 as

if set forth fully herein.

107.     Plaintiff has exclusive rights in and under the trademark DARKSIDE NYC.

108.     The dominant portion of the mark, and the only element of the mark in which

Plaintiff has an exclusive right to limit other's use thereof, is DARKSIDE.

109.     Defendants have had actual and constructive notice of Plaintiffs' rights in and under

the mark since at least 2014, as well as Plaintiffs' continued use of the mark since at least

1992.

110.     Defendants know that Plaintiff has the sole right to use DARKSIDE as a source

indicator for the Trademark Registered Services.

111.     Plaintiff is the senior user of DARKSIDE as a source indicator for the Trademark

Registered Services since it began using the term in 1992, whereas, upon information and

belief, Defendant did not start using DARKSIDE as a source indicator for the Trademark

Registered Services until 2011.

112.     Because of Defendant's unauthorized use of DARKSIDE to denote the Trademark Registered Services, it is creating confusion, mistake, and/or deception among the public as to the source or sponsorship of Plaintiff's services.

113.     As a result of Defendant's unauthorized use of DARKSIDE, the public is likely to be confused as to whether the Defendant's services are authentic and/or have been approved by Plaintiff.

114.     Defendants infringement of the Trademark, by incorporating the entirety of the word DARKSIDE, the dominant portion of the Trademark wherein Plaintiff claims exclusive use, to denote the Trademark Registered Services, is willful, intended to reap the benefit of the goodwill of Plaintiff, and violates Section 32 (1) of the Lanham Act, 15 U.S.C. § 1114(1).

115.     The aforesaid conduct of Defendant is causing immediate and irreparable injury to Plaintiff and its goodwill and reputation, and will continue both to damage Plaintiff and to deceive the public unless enjoined by this Court.

116.     Defendants' foregoing wrongful acts constitute infringement of unregistered trademarks in violation of 15 U.S.C.A. § 1125.

117.     As a result, Plaintiffs have been damaged in an amount to be determined at trial, but not less than the total profits generated by Defendants through their use and misuse of the confusingly similar mark.

## SECOND CLAIM FOR RELIEF

(Unfair Competition Pursuant to 15 U.S.C.A. § 1125)

118.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 118 as if set forth fully herein.

119.     Defendants' foregoing wrongful acts constitute unfair competition in violation of 15

U.S.C.A. § 1125(a)(1)(A).

120.    As a result, plaintiff has been damaged in an amount to be determined at trial, but not less than the total profits generated by Defendants through their use and misuse of confusingly similar marks.

121.    Defendant's unauthorized use of the word DARKSIDE in interstate commerce, the dominant portion of the Trademark wherein Plaintiff claims exclusive use to identify the Trademark Registered Services, constitutes a false designation of origin and a false description or representation that Defendants' provision of such services is authorized by Plaintiff.

122.    Defendant's usage of DARKSIDE in such a manner deprives Plaintiff of the ability to maintain the prestige, reputation, and goodwill of the Band and Plaintiff's provision of the Registered Trademark Services.

123.    Defendant is using "Darkside" with full knowledge that it is associated exclusively with Plaintiff and the Trademark Registered Services.

124.    Defendant's acts of unfair competition are willful and deliberate and with an intent to reap the benefit of the goodwill and reputation associated with Plaintiff.

125.     Defendants' performance of the Registered Trademark Services under Defendants' Trademarks (as they incorporate DARKSIDE in its entirety) is in violation of Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A).

126.    The aforesaid conduct of Defendant is causing immediate and irreparable injury to Plaintiff and to its goodwill and reputation, and will continue both to damage Plaintiff and to deceive the public unless enjoined by this Court.

127.    Plaintiff has no adequate remedy at law.

**THIRD CLAIM FOR RELIEF**
(Federal Trademark Dilution (15 U.S.C. § 1125(c))

128.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 127 as if set forth fully herein.

129.     The Trademark is famous and well known throughout the United States, having been used exclusively and extensively for over 20 years.

130.     By reason of extensive advertising and use, including the many thousands of dollars that Plaintiff has spent promoting, policing, and marketing the mark, which includes but is not limited to the use of focus groups, the Trademark has become highly distinctive and is uniquely associated with Plaintiff.

131.     Defendant's commercial use of "Darkside" to identify the Trademark Registered Services has diluted and continues to dilute the distinctive quality of the Trademark by lessening Plaintiff's capacity to identify and distinguish Plaintiff as the sole source for the Trademark Registered Services bearing, or provided in conjunction with, the word "Darkside".

132.      Defendant's unlawful use of "Darkside", as the main element of Defendant's Trademarks, is intended to and has the effect of trading on Plaintiff's reputation and causing dilution of Plaintiff's famous mark.

133.     Upon information and belief, Defendant does not own any federal or state registrations or trademark applications for any mark that includes, in whole or in part, DARKSIDE, and cannot assert any rights in the word DARKSIDE that are prior to Plaintiff's first use of DARKSIDE.

134.     Defendant's conduct is in violation of Section 43 (c) of the Lanham Act, 15 U.S.C. § 1125(c).

135.     The aforesaid conduct of Defendant is causing immediate and irreparable injury to Plaintiff and its goodwill and reputation, and will continue to damage Plaintiff unless enjoined by this Court.

136.      Plaintiff has no adequate remedy at law.

## FOURTH CLAIM FOR RELIEF

(Infringement of Common Law Trademark Rights Under N.Y. G.B.L. § 360-o)

137.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 136 as if set forth fully herein.

138.     Plaintiffs have acquired common law rights in the Trademark through their continuous use of it in New York and the Tri-State area to denote the source for the Trademark Registered Services.

139.     Defendants' use of "Darkside" and "Darkside USA" in connection with entertainment services, sound recordings, and the sale of related goods creates a substantial likelihood of consumer confusion.

140.     Accordingly, Defendants' foregoing use and misuse of the confusingly similar marks constitutes trademark infringement in violation of N.Y. G.B.L. § 360-o.

141.     As a result, Plaintiffs have been damaged in an amount to be determined at trial, but in any event, no less than the total profits generated by Defendants through their use and misuse of confusingly similar marks.

142.     Plaintiff has no adequate remedy at law.

## FIFTH CLAIM FOR RELIEF

(Dilution under N.Y. General Business Law § 360-l)

143.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 142 as if set forth fully herein.

144.     Defendant's conduct creates blurring or the likelihood of blurring by, *inter alia*, establishing multiple confusingly similar names marks relating to entertainment services, live music performances, sound recordings, and production of sound recordings, within the United States and particularly in the New York City area.

145.     Defendants' conduct creates tarnishment or the likelihood of tarnishment by, *inter alia*, creating an association between the Band and Defendants' music, a type of music likely to be disdained by many of Plaintiffs' existing and potential fans, as well as by causing Plaintiffs a loss of control over the quality of goods and services being offered, as well as its reputation.

146.     The Band prides itself on having created an "underground" metal/punk/hardcore band that rarely seeks out publicity. That is what many of its fans like and are attracted to, that, unlike many of today's musicians, the Band is not desperate for social media "likes" and engagement.

147.     Defendants' band is the opposite; they crave publicity and constantly feel the need to be seen and referenced in the media.

148.     In order not to be overwhelmed and forgotten on the Internet because Defendants have so aggressively attempted to overshadow Plaintiff, Plaintiff has been forced to be more engaging on the Web, even though that is not its style and not what many of its fans want.

149.     The Band has spent significant sums of money to produce albums that it has had trouble recouping because the lesser skilled Defendants, absent the showmanship of Plaintiff, has tarnished Plaintiff's reputation because consumers believe Defendants sound recordings and live performances to be Plaintiff.

150.     Defendants' unlawful and unfair conduct has led to a material diminution of the reputation and goodwill established by Plaintiffs in the Trademark.

151.     Defendants' conduct therefore constitutes trademark dilution in violation of N.Y. G.B.L. § 360-l.

152.     As a result, Plaintiffs have been damaged in an amount to be determined at trial, but in any event, no less than the total profits generated by Defendants through their use and misuse of confusingly similar marks.

153.     Plaintiff has no adequate remedy at law.

## FIFTH CLAIM FOR RELIEF

(Unfair Competition, Trademark Infringement and Misappropriation
Under New York Common Law)

154.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 153 as if set forth fully herein.

155.     Defendants' use of "Darkside" as stated herein divests Plaintiff of the ability to maintain the prestige and reputation of its brand.

156.     Defendants are using "Darkside" as stated herein with full knowledge that it is associated exclusively with Plaintiff and exclusively designates the Trademark Registered Services.

157.     Defendant's sale and distribution of the Trademark Registered Services under or in conjunction with the word "Darkside" constitutes common law unfair competition.

158.     Defendant's acts of unfair competition are willful and deliberate and with an intent to reap the benefit of the goodwill and reputation associated with the Trademark.

159.     Furthermore, Defendants' conduct of trademark infringement and misappropriation of Plaintiffs' goodwill under the common law of New York.

160.     As a result, Plaintiffs have been damaged in an amount to be determined at trial, but in any event, no less than the total profits generated by Defendants through their use and

misuse of confusingly similar marks.

161.     Plaintiff has no adequate remedy at law.


## FIRST CLAIM FOR RELIEF AGAINST MATADOR

(Vicarious Trademark Infringement)

162.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 161 as if set forth fully herein.

163.     Matador knows or has reason to know of Defendants' infringement of the Trademark.

164.     Matador exercises significant control over Defendants' infringing activities, both through its control over the band's activities, in its promotion of them, as well as its control over the Defendants' Site containing the infringing marks.

165.     Matador supplies Defendants with substantial resources, skill and capital to further their infringing activities.

166.     Upon information and belief, Matador was solely responsible for orchestrating the Press Release and the continuation of the duping of the public by leading the public to believe that Defendants-not Plaintiff-are the rightful owners of DARKSIDE.

167.     Matador, both directly and indirectly, profit from Defendants' infringing activities.

168.     It profits directly because it receives a percentage of any monies generated by Defendants for the sale of their music under the name DARKSIDE.

169.     Matador benefits indirectly as its cache is increased by the goodwill associated with Plaintiff because people will believe that Plaintiff is signed with Matador.

170.     Accordingly, Matador is liable for contributory trademark infringement.

171.     As a result of Matador's wrongful actions, Plaintiffs has been damaged in an amount

to be determined at trial, but in any event, no less than the total profits generated by Defendants through their use and misuse of confusingly similar marks.

## SECOND CLAIM FOR RELIEF AGAINST MATADOR

(Contributory Trademark Infringement)

172.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 171 as if set forth fully herein.

173.     Matador knows or has reason to know of Defendants' infringement of the Trademark.

174.     Matador exercises significant control over Defendants' infringing activities, both through their control over the band's activities as well as its control over their websites containing the infringing marks.

175.     Matador supplies Defendants with substantial resources, skill and capital to further their infringing activities.

176.     Matador directly profits from Defendants' infringing activities.

177.     Moreover, upon information and belief, Matador has encouraged and induced Defendants to continue their infringement.

178.     To wit, upon information and belief, Matador has informed Defendants that their revenues will increase based on the number of tracks sold, streamed and concerts attended by fans of the group under the name DARKSIDE.

179.     Therefore, Defendants have been incentivized to continue their infringement so that they can increase the coffers of themselves as well as Matador.

180.     As a result of Matador and Other People's wrongful actions, Plaintiffs have been damaged in an amount to be determined at trial, but in any event, no less than the total profits generated by Defendants and Matador through their use and misuse of confusingly

similar marks.

**WHEREFORE**, Plaintiff SATAN WEARS SUSPENDERS, INC. p/k/a Darkside or Darkside NYC demands judgment as follows:

1. Enjoining DEFENDANTS and any employees, agents, servants, officers, representatives, directors, attorneys, successors, affiliates, assigns, and entities owned or controlled by DEFENDANTS and all those in active concert and participation with DEFENDANTS and each of them who receives notice directly or otherwise of such injunction from:

a. imitating, copying, or making unauthorized use of the Trademark;

b. unless authorized by Plaintiff, importing, exporting, manufacturing, producing, distributing, circulating, selling, offering for sale, advertising, promoting, or displaying any product bearing the Trademark or the word "Darkside";

c. using any simulation, reproduction, counterfeit, copy, or colorable imitation of the Trademark or the word "Darkside" in connection with the importation, promotion, advertisement, display, sale, offering for sale, manufacture, production, circulation, or distribution of any of the Trademark Registered Services;

d. using any false designation of origin or false description, or performing any act which is likely to lead members of the trade or the public to believe that any infringing product manufactured, distributed, or sold by Defendant is in any manner associated or connected with Plaintiff, or is sold, manufactured, licensed, sponsored, approved, or authorized by Plaintiff;

e. engaging in any other activity constituting unfair competition with Plaintiff, or constituting infringement of the Trademark;

f. taking any action, including through the use of the Trademark or any simulation, reproduction, copy, or colorable imitation thereof, that dilutes the unique association between the "Darkside" and Plaintiff, or that tarnishes the reputation or image of Plaintiff;

g. disposing of, destroying, altering, moving, removing, concealing, tampering with, or in any manner secreting any business records (including computer records) of any kind, including invoices, correspondence, books of account, receipts, or other documentation relating to or referring in any manner to the manufacture, advertising, receipt, acquisition, importation, purchase, sale, offer for sale, or distribution of any merchandise bearing any simulation, reproduction, counterfeit, copy, or colorable imitation of the Trademark or the word "Darkside" in conjunction with the Trademark Registered Services;

i. instructing, assisting, aiding, or abetting any other person or entity in engaging in or performing any of the activities referred to in subparagraphs (a) through (i) above.


2. Directing that Defendant make available to Plaintiff for review, inspection, and copying all books, records (including but not limited to all hard drives on computers used for business purposes, including but not limited to servers, as well as all computer disks and back-up media) and all other documents concerning all transactions relating to the purchase, sale, or unauthorized use of services, products or packaging incorporating the Trademark or the word "Darkside" in conjunction with the Trademark Registered Services and provide Plaintiff with the names, addresses, and all other contact information in its possession for the source(s) of such services, products, and packaging, including all manufacturers, distributors, and suppliers.

3. Directing that Defendant recall from distributors, retailers, and all other recipients any and all services, products and packaging sold or distributed by Defendant under or in connection with the

Trademark or the word "Darkside" in conjunction with the Trademark Registered Services and, upon recall, to deliver such services or goods, in either or both cases, to Plaintiff.

4. Directing that Defendant cancel any advertising, regardless of the medium, using the Trademark or the word "Darkside" in conjunction with the Trademark Registered Services.

5. Directing that Defendant deliver to Plaintiff's counsel for destruction, at Defendant's cost, all signs, promotional materials, advertising material, catalogs, and any other item that bears, contains, or incorporates the Trademark or the word "Darkside" in conjunction with the Trademark Registered Services.

6. Requiring Defendant to account for and pay over to Plaintiff three times the profits realized by Defendant from its infringement of the Trademark and its unauthorized use of the word "Darkside" in conjunction with the Trademark Registered Services, and its unfair competition with Plaintiff.

7. Awarding Plaintiff its actual damages, trebled pursuant to 15 U.S.C. § 1117(a), arising out of Defendant's acts of willful unfair competition and trademark dilution.

8. Awarding to Plaintiff interest, including pre-judgment interest, on the foregoing sums.

9. Awarding Plaintiff its costs in this action, including reasonable attorneys' fees and expenses, pursuant to 15 U.S.C. § 1117(a).

10. Awarding Plaintiff exemplary and punitive damages to deter any future willful infringement in an amount to be determined at trial, but not less than $1,000,000.00

11. Directing such other action as the Court may deem appropriate to prevent the trade and public from deriving the erroneous impression that any goods or services offered, advertised, or promoted by or on behalf of Defendant are authorized by Plaintiff.

12. Directing that Defendants file with the Court and serve upon Plaintiff's counsel within thirty (30) days after entry of judgment a report in writing under oath setting forth in detail the manner and form in which Defendants have complied with the above.

13. Awarding Plaintiff such other and further relief as the Court may deem just and proper.

## <u>Jury Demand</u>

Plaintiff hereby demands a trial by jury as to all issues so triable.

Dated: New York, New York
     January 29, 2020

               PIERCE & KWOK LLP

               _____
               Aaron H. Pierce, Esq.
               299 Broadway, Ste. 1405
               New York, New York 10007
               (212) 882-1752
               Aaron.pierce@piercekwok.com
               *Attorneys for Plaintiff*
               SATAN WEARS SUSPENDERS, INC.